IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ERNESTO ORDONEZ, et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case No. 10-CV-05708 |
| v. ) | |
| ) | Judge: Grady |
| ) | |
| AKORAT METAL FABRICATORS, INC., ) | Magistrate Judge: Valdez |
| et al. ) | |
| Defendants. ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT SHALE INLAND STAMPING AND FABRICATING LLC.'s MOTION FOR SUMMARY JUDGMENT**

**I.      INTRODUCTION**

This is a case for owed wages under the Fair Labor Standards Act U.S.C. §201, *et seq.* ("FLSA"), and parallel state laws. Plaintiffs were employees of Defendants Akorat Metal Fabricators, Inc., Smithco Fabricators, Inc., Wisconsin Tool and Stamping Co., and JJD Industries, Inc., referred to hereinafter as ("Wisconsin Tool Defendants"), as well as John J. Dombek III ("Dombek III"), and John Dombek, Jr. ("Dombek, Jr."), referred to hereafter as ("the Dombeks"). Plaintiffs were not compensated at all for work they performed for the above referenced Defendants during multiple individual work weeks. The wage violations resulted primarily from The Wisconsin Tools Defendants' and the Dombeks' practice of issuing checks drawn from accounts with insufficient funds, resulting in scores of bounced checks.

On September 21, 2010, Shale Inland Stamping and Fabricating, LLC ("Shale") purchased the assets of the Wisconsin Tool Defendants from First Midwest Bank, the same bank that held the Wisconsin Tool Defendants' payroll accounts from which checks consistently bounced. SMF ¶ 10-12, ¶19; See also Group Exhibit F. First Midwest Bank had foreclosed on

the assets of the Wisconsin Tool Defendants pursuant to credit agreements between the bank, the Wisconsin Tool Defendants, and the Dombeks. SMF ¶ 17

Shale continued to operate the Wisconsin Tool Defendants' facilities without interruption. Shale maintained the same managers and workforce and continued to manufacture the same products and sell to the same customers. SMF ¶ 22-27. Indeed, after acquiring the assets of the Wisconsin Tool Defendants, Shale sold the inventory that it had acquired in the purchase, inventory produced via the Plaintiffs' uncompensated labor, to the Wisconsin Tool Defendants' very same customers. SMF ¶ 26.

Shale has filed a motion for summary judgment asserting that it cannot bear successor liability because it is a *bona fide* purchaser of the Wisconsin Tool Defendants' assets. However, Plaintiffs' claims for unpaid federal minimum wages and overtime arise under a federal labor statute, the FLSA, and Plaintiffs' claim of successor liability is based on the federal labor-law doctrine of successorship.

In federal employment law cases, federal courts have consistently interpreted successor liability more broadly than the state law elements that Shale has enumerated in its Motion for Summary Judgment in order to effectuate the remedial purposes of labor statutes such as the FLSA, ERISA, Title VII and the NLRA, among others. See *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac,* 920 F.2d 1323, 1326 (7th Cir. Ill. 1990) *citing* "*Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 182 (1973) As discussed further below, Shale bears successor liability for Plaintiffs' claims if a) Shale had notice of these claims; and b) there is substantial continuity in operations between Shale and predecessor companies, the Wisconsin Tool Defendants. Shale's Motion for Summary Judgment is premature at this point as there is a genuine issue of material fact as to whether Shale had notice of Plaintiffs' claims and whether a

substantial continuity in the operations between Shale and the Wisconsin Tool Defendants existed. At a minimum, Plaintiffs are entitled to do discovery on these issues.

## II. LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 56(c), a moving party is entitled to summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "Once the moving party has produced evidence to show that it is entitled to summary judgment, the party seeking to avoid such judgment must affirmatively demonstrate that a genuine issue of material fact remains for trial." *Hardrick v. Airway Freight Systems, Inc.,* 63 F. Supp. 2d 898, 901 (N.D. Ill. 1999). The party opposing summary judgment must produce specific facts in affidavits or otherwise showing that there is a genuine issue for trial and may not merely rely on conclusory pleadings to withstand summary judgment. *Klegerman v. F.G. Apparel, Inc.,* 1986 WL 2531 (N.D. Ill. 1986). The party opposing summary judgment is entitled to all reasonable inferences that can be made in its favor. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

## III. ARGUMENT

### 1. The Labor-Law Doctrine of Successorship Liability is Broadly Construed.

The labor-law doctrine of successorship liability was established by the U.S. Supreme Court in the context of the National Labor Relations Act ("NLRA") in *Golden State Bottling Co. v. NLRB,* in order to protect federal rights and effectuate federal policies. 414 U.S. 168, 185 (1973). In *Golden State Bottling Co.,* the Supreme Court held that the labor-law doctrine of Successorship allows lawsuits against even a genuinely distinct purchaser of a business if (1) the

successor had notice of the claim before the acquisition and (2) there was substantial continuity in the operation of the business before and after the sale. *Id* at 184-185; *See also Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. Ill. 1995).

This doctrine has since been extended to nearly every federal employment statute. *See for example: Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323 (7th Cir. 1990) (Multiemployer Pension Plan Amendments Act ("MPPAA"); *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1237 (7th Cir. 1986) (holding that the Congressional intent to eliminate employment discrimination justified the "liberalization" of common law successorship rules "in favor of victims of discrimination in employment"); *Secretary of Labor v. Mullins*, 281 U.S. App. D.C. 251, 888 F.2d 1448 (D.C. Cir. 1989) (Mine Safety and Health Act); *Criswell v. Delta Air Lines, Inc.*, 868 F.2d 1093 (9th Cir. 1989) (Age Discrimination in Employment Act); *Trustees for Alaska Laborers-Construction Industry Health & Sec. Fund v. Ferrell*, 812 F.2d 512 (9th Cir. 1987) (ERISA); *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740 (7th Cir. 1985) (42 U.S.C. § 1981); *E.E.O.C. v. Vucitech*, 842 F.2d 936 (7th Cir. 1988) (Title VII); and *Steinbach v. Hubbard*, 51 F.3d 843, 845 (9th Cir. Wash. 1995) (Extending labor law doctrine of successorship to FLSA stating: "The FLSA was passed to protect workers' standards of living through the regulation of working conditions... That fundamental purpose is as fully deserving of protection as the labor peace, anti-discrimination, and worker security policies underlying the NLRA, Title VII, 42 U.S.C. § 1981, ERISA, and MPPAA").

The common thread running through these cases where courts have applied the broader labor-law doctrine of successor liability is the important remedial purpose that Congress sought to achieve through the statutes under which Plaintiffs brought their claims. Where employee protections are concerned, "judicial importation of the concept of successor liability is essential to avoid undercutting Congressional purpose by parsimony in provision of effective remedies." *Steinbach v. Hubbard*, 51 F.3d 843, 845 (9th Cir. Wash. 1995); *citing Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1237 (7th Cir. 1986). The remedial purpose that Congress sought to achieve

in passing the FLSA, the statute under which employees bring their claims, was to protect workers' standards of living through the regulation of working conditions. 29 U.S.C. § 202; *Steinbach v. Hubbard*, 51 F.3d 843, 845 (9th Cir. Wash. 1995). Entering summary judgment against Plaintiffs at this early stage of the litigation would be contrary to the labor law doctrine of successorship liability and would undermine this congressional purpose.

As explained further below, Plaintiffs clearly establish that there has been substantial continuity between the Wisconsin Tools Defendants and Shale. SMF ¶ 22-27. Plaintiffs have also established that there is a genuine issue of fact as to whether Shale had notice of Plaintiffs' claims prior to acquiring the assets of the Wisconsin Tool Defendants to merit further discovery and trial on these issues. SMF ¶10-14, ¶19-21.

### 2. Shale's reliance on the common law rule is misplaced.

In its Motion for Summary Judgment, Defendant Shale relies on the common law rule of successor liability under which "a corporation that merely purchases for cash the assets of another corporation does not assume the seller corporation's liabilities." *Travis v. Harris Corp.*, 565 F.2d 443, 446 (7th Cir. 1977). Under the common law rule, successor liability only attaches if: (1) there is an express or implied assumption of liability; (2) the transaction amounts to a consolidation, merger, or similar restructuring of the two corporations; (3) the purchasing corporation is a "mere continuation" of the seller; and (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts. Shale argues that it has no successor liability because it was: a) a *bona fide* purchaser with no prior connection to the predecessor corporation; and b) it acquired the assets through a foreclosure sale. See pg 8 ¶ 2 of Shale's Memorandum of Law in Support of Shale's Motion for Summary Judgment doc 43:

> "Plaintiffs do not and cannot challenge Shale's status as a bonafide purchaser that had (and has) no connection whatsoever to the Wisconsin Tool Defendants... Shale did not even buy the assets from the Wisconsin Tool Defendants, but instead bought them from the Bank pursuant to a publicly advertised UCC sale."

However, Shale's reliance on the common law rule is misplaced. As the Seventh Circuit instructed in rejecting the common law test of successor liability, "[T]he perimeters of the labor-law doctrine of successorship have not been so narrowly confined." *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1325-1326 (7th Cir. Ill. 1990), *citing Golden State Bottling Co. v. NLRB*, 414 U.S. 168, (1973). The U.S. Supreme Court and this Circuit have both found successor liability for *bona fide* purchasers in a number cases in order to vindicate important remedies and rights created by Congress. In *Golden State Bottling*, for example, the Supreme Court held that liability under the NLRA could be imposed on a successor, a *bona fide* purchaser with no connection with the predecessor business, for a predecessor's unlawful discharge of an employee. The Court ruled that an employer who substantially assumes a predecessor's assets, continues the predecessor's operations without interruption or substantial change, and who has notice of a pending unfair labor practice charge at the time of acquisition, can be required to remedy the unfair labor practice. *Golden State Bottling Co. v. NLRB*, 414 U.S. at 184-185 (1973). The Court further held that notice of a violation of the federal statute may be drawn as a logical inference from the facts. *Id.*

Additionally, existing case law overwhelmingly confirms that an intervening foreclosure sale affords an acquiring corporation no automatic exemption from successor liability when Federal rights are involved. See *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1325, 1327 (7th Cir. 1990). See *EEOC v. SWP, Inc.*, 153 F. Supp. 2d 911, 924 (N.D. Ind. 2001); *See also Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 124 F.3d 252, 267-68 (1st Cir. 1997) (citing cases from several jurisdictions that "overwhelmingly" support this holding). In *Upholsterers' Int'l; Union Pension Fund*, for example, a successor company acquired a predecessor company's assets through a foreclosure sale, as in this case. 920 F.2d 1323 at 1325. The predecessor company had fallen severely behind on its contributions to its employee pension fund. *Id.* The successor company and its officers were *bona fide* purchasers, completely unrelated to the predecessor company. *Id.* The district court granted summary judgment against the pension fund on the basis that no commonality of ownership existed

between the predecessor and successor companies and therefore no successor liability could apply. The Seventh Circuit reversed the district court, finding that the labor-law doctrine of successorship was broader than the common law doctrine. *Id.* at 1325-1326.

### 3. Plaintiffs' Evidence Establishes An Issue Of Fact As To Whether Substantial Continuity Of Operations Existed

Plaintiffs' evidence more than establishes an issue of fact as to whether continuity of operations existed after Shale's purchased the Wisconsin Tools Defendants' assets. Continuity is satisfied if no major changes are made in the operation. See *E.E.O.C. v. G-K-G, Inc.*, 39 F.3d 740, 748 (7th Cir. 1994) *citing International Union Pension Fund v. Artistic Furniture*, 920 F.2d 1323, 1327 (7th Cir. 1990); *EEOC v. Vucitech*, 842 F.2d 936, 944-45 (7th Cir. 1988). While Shale highlights that it does not share the ownership of the Wisconsin Tool Defendants' assets with the Dombeks, continuity of ownership is only one factor out of many that courts will consider in deciding to impose successor liability when federal labor rights are involved:

> "Contrary to Defendants' suggestion, continuity in this context is not only a question of an identity of officers, directors and shareholders; it also is an 'amalgamation of a number of indicia,' including whether the post-sale business (1) uses the same location, workforce, and supervisors; (2) maintains the same jobs under substantially the same working conditions; (3) uses the same machinery, equipment, and methods of production, and (4) provides the same products and services." *Reed v. Lawrence Chevrolet, Inc.*, 14 Fed. Appx. 679, 687 (7th Cir. Wis. 2001); See *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1236 (7th Cir. 1986)); See also *Steinbach v. Hubbard*, 51 F.3d 843, 846 (9th Cir. 1995).

The facts in this case bear great resemblance to those in *EEOC v G-K-G*, where the Seventh Circuit affirmed a finding of successorship. Plaintiffs' work was not interrupted for a single day due to the transfer of assets from the Wisconsin Tool Defendants to Shale. SMF ¶ 22. All aspects of the Wisconsin Tool Defendants' operation remained unchanged. SMF ¶ 23-27.

Plaintiffs and the great majority, if not all other employees of the Wisconsin Tool Defendants, remained employed by Shale. SMF ¶ 23. Shale continued to manufacture the same products through the same methods of production as its predecessors. SMF ¶ 25-27. Shale continued to sell to the same clients as its predecessors. SMF ¶ 26. Plaintiffs jobs and their wages bared no change after Shale acquired the assets. SMF ¶27.

Shale maintains, however, that the management at this industrial complex is completely different. See Alan Blankshain's Affidavit ¶15, attached to Shale's Statement of Facts, doc. #44-1. The fact is that Alan Blankshain, the new CEO at Shale, is the only new element in the operations of the former Wisconsin Tool Defendants that Plaintiffs have noticed. SMF ¶ 24 All plant managers remained the same before and after Shale acquired these Defendants' assets. SMF ¶ 24. Even Ms. Maquito, believed to have been the former President of the Wisconsin Tool Defendants, was temporarily employed by Shale after its acquisition. SMF ¶ 24. All of these individuals had notice of Plaintiffs' claims. SMF ¶ 13-14, ¶20. While, Shale claims that Mr. Blankshain alone is "the management", Plaintiffs dispute this factually. As in *E.E.O.C. v. G-K-G,*, Shale vertically integrated. See *E.E.O.C. v. G-K-G, Inc.* at 748 (stating under very similar circumstances as this case "if this is not a case of substantial continuity, we don't know what is").

At the very least, the attached affidavits along with Plaintiffs' undisputed facts and the undisputed facts enumerated in Shale's Memorandum of Law establish a genuine factual dispute as to whether there is substantial continuity in this matter under the law. See page 4 of Shale's Memorandum of Law in Support of its Motion of Summary Judgment, Doc. # 43. Summary judgment for Defendant on this matter would be premature.

### 3. A Genuine Issue of Fact Exists As To Whether Defendant Shale Had Notice of Plaintiffs' Claim Against The Wisconsin Tool Defendants

While Plaintiffs have not had the opportunity to perform discovery on this matter, the facts that are currently known are sufficient to draw a reasonable inference that Shale had notice of Plaintiffs' claims or, at the very least, create a genuine issue of fact as to whether Shale had notice of such claims. See *Golden State Bottling Co. v. NLRB*, 414 U.S. 168 at 173 (1973); *NLRB v. South Harlan Coal Inc.*, 844 F.2d 380, 385 (6th Cir. 1988); *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1329 (7th Cir. Ill. 1990) (Notice can be proven not only by pointing to facts that conclusively demonstrate actual knowledge, but also by presenting evidence that allows the fact finder to imply knowledge from the circumstances.) Indeed, Mr. Blankshain's affidavit attached to Shale's Motion for Summary judgment, limits itself to denying any kind of common ownership or connection between Shale and the Dombeks rather than denying any actual notice of Plaintiffs' claims. Shale merely casts the issue of notice as "irrelevant" in the bonafide purchaser context. See page 9 of Shale's Memorandum of Law in Support of its Motion of Summary Judgment, Doc. # 43

The primary practice that gave rise to the FLSA violations in this matter was the issuance of paychecks drawn from accounts with insufficient funds to compensate all employees. SMF ¶ 9-12. This practice caused significant strife at the work place and every member of management of the Wisconsin Tools Defendants, all of whom remain members of management for Shale today, was aware of the problem. SMF ¶ 13-14. The sight of thirty plus employees outside the offices of Ms. Maquito, the former President of the Wisconsin Tool Defendants, demanding their wages was a noticeable one. SMF ¶ 13. Andrew Wrona, the plant manager for one of the Wisconsin Tool Defendants, was among those individual protesting the nonpayment of wages.

SMF ¶ 14.

Mr. Blankshain and the other principal officers of Shale were well positioned to receive notice of the Wisconsin Tool Defendants' FLSA liabilities. Mr. Blankshain visited 9521 W Anslie Street and was seen speaking with members of management and inspecting the operations of the Wisconsin Tools Defendants several week before Shale acquired these Defendants' assets. SMF ¶ 20. Mr. Blankshain was seen speaking with Andrew Wrona, who himself had experienced some nonpayment of wages. SMF ¶ 20. Mr. Chadwick Butell, one of Shale's attorneys stated to counsel for Plaintiffs earlier this year that Shale had initially considered employing the Dombeks, but had decided against it after discovering more information about how the Dombeks ran their business. It is not credible that any due diligence by Shale whatsoever did not uncover information about the scores of bounced checks, stories of the strife caused by the nonpayment of wages, or other evidence of severe FLSA violations. It is likewise not credible that neither Mr. Wrona, nor Ms. Maquito, nor anybody else that Mr. Blankshain or Shale's other principal officers spoke to, and continued to employ, ever informed them of these FLSA violations. Indeed, Ms. Maquito's direct knowledge of the problem and that of other plant mangers and supervisors of the Wisconsin Tool Defendants who continued working for Shale in the same capacity impute Shale with knowledge. Plaintiffs are at least entitled to inquire further about this matter, and summary judgment at this point would be premature.

Furthermore, First Midwest Bank held the Wisconsin Tools Defendants' payroll account until shortly before this bank sold the assets of the Wisconsin Tools Defendants to Shale. SMF ¶ 10; See also bounced checks issued from First Midwest Bank Account, attached hereto as Group Exhibit F. It is reasonable to infer that First Midwest Bank was aware of the scores of bounced checks. Indeed, on many occasions bank clerks at First Midwest bank locations instructed

several Plaintiffs and their coworkers to not even bother trying to cash their paychecks, because the accounts lacked funds SMF ¶ 12. Furthermore, it is reasonable to infer that First Midwest Bank itself informed Shale of this problem.

Mr. Blankshain's affidavit states only that Shale received Notice of Private Disposition of Collateral from First Midwest Bank on September 3, 2010. See Affidavit of Alan Blankshain ¶ 6, attached as Exhibit 1 to Shale's Motion for Summary Judgment. What Mr. Blankshain's fails to disclose in his affidavit, however, is that Shale was engaged in negotiations with First Midwest Bank, and perhaps the Dombeks themselves, for several weeks, if not several months prior to this date, thereby leaving plenty of time for Shale to perform its due diligence and receive notice of Plaintiffs' claims. See Section 5 of Second Amended Forbearance Agreement entered into by the Wisconsin Tool Defendants, the Dombeks and First Midwest Bank on August 12, 2011, referencing the possibility of Shale purchasing the assets of the Wisconsin Tool defendants' assets, attached hereto as Exhibit I. SMF ¶ 16.

Shale's contention that it had no way to protect itself or negotiate a lower price for the purchase of the Wisconsin Tool Defendants' assets to account for potential successor liability and that imposing liability in this context would be unfair lacks merit under the circumstances. As soon as Shale had notice of Plaintiffs' claims, Shale would have been in a perfect position to negotiate with the same bank that held the underfunded payroll accounts.

### 4. A Genuine Issue Of Fact Exists As To Plaintiffs' Ability To Recover From The Dombeks And Wisconsin Tool Defendants Prior To The Sale Of Assets.

The two essential requirements that Plaintiffs would have to meet to impose successor liability are notice and substantial continuity. *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. Ill. 1995). The

Federal common law doctrine of successor liability is, however, grounded in equity. *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 746 (7th Cir. Ill. 1985). Courts may well consider a predecessor's ability to pay as a factor in deciding whether imposing successor liability is fair. Contrary to Shale's contentions, however, a predecessor's ability to pay is not dispositive. See *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48 at 51 (7th Cir. Ill. 1995) ("Instead of being dispositive, however, the availability of relief from the predecessor is a factor to be considered along with other facts in a particular case.")

In *EEOC v. G-K-G*, for example, the Seventh Circuit affirmed the district court's imposition of successor liability despite the fact that the predecessor company had retained sufficient assets to satisfy a judgment for Plaintiff and had offered to indemnify the successor for any judgment entered against it. Clearly, Plaintiffs could have recovered from the predecessor company before and after the sale of assets in EEOC v G-K-G, but the Court affirmed the imposition of successor liability because the requirements of notice and substantial continuity were met. 39 F.3d 740, 747-748 (7th Cir. Ill. 1994).

Even if Plaintiffs conceded, which they do not, that the Dombeks would not have been unable to provide them with any relief prior to Shale buying the Wisconsin Tool Defendants' assets, Shale could still be liable as a successor. Note also, for example, that in *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, an ERISA case, Plaintiffs were unable to obtain any relief from the predecessor Defendant which had filed for bankruptcy prior to the successor acquiring the distressed company's assets. While the successor argued that allowing Plaintiffs in that case to proceed against the successor would provide Plaintiff in that matter with a windfall, the Seventh Circuit Court dismissed the argument

stating that "what the imposition of successor liability would accomplish, and what the district court objected to, would be a second opportunity for a creditor to recover on liabilities after coming away from the bankruptcy proceeding empty handed. But a second chance is precisely the point of successor liability..." 59 F.3d 48, 51 (7th Cir. Ill. 1995)

Indeed some Courts in this circuit will not even consider the "ability to pay" factor in deciding whether to impose successor liability or not. See *Reed v. Lawrence Chevrolet, Inc.*, 14 Fed. Appx. 679, 687 (7th Cir. Wis. 2001) (reversing summary judgment against Plaintiff's Title VII claim on issue of successor liability, limiting inquiry to issues of notice and continuity and remanding to the district Court for further discovery.

Notwithstanding the above, the actual indebtedness of the Wisconsin Tools Defendants and the Dombeks, and the ability of such Defendants to compensate Plaintiffs prior to the sale of assets, is an issue that is factually disputed. See. SMF ¶ 29. Furthermore, the $7.9 million judgment entered against the Dombeks, which Shale references in its Statement of Material Facts doc. #44, was entered several weeks *after* Shale acquired the assets of the Wisconsin Tools Defendants. While the solvency of the Dombeks and the Wisconsin Tool Defendants prior to Shale's acquisition of their assets remains in dispute. Most importantly, however, Shale acquired the inventory that was produced the Plaintiffs' uncompensated labor as well as the Wisconsin Tool Defendants' accounts. SMF ¶ 19. It is certainly reasonable to infer that the value of this inventory and accounts had Shale not purchased it would provided the Wisconsin Tool Defendants with the ability to provide Plaintiffs with relief.

The chance of recovering from the Wisconsin Tools Defendants now, after Shale acquired their assets, or from the Dombeks, with a multimillion dollar entered against them, is highly unlikely. Absent the imposition of successor liability, Plaintiffs will be left without

remedy and the remedial purpose of the FLSA will have been frustrated.

### 5. Entering Summary Judgment At This Stage of the Litigation Would be Inequitable And Would Undermine The Remedial Purpose Of The FLSA

The question in these cases, "is not whether the successor doctrine should ever apply, but whether, under the particular facts of the case to be decided, successor liability could equitably be imposed to further a clearly established objective." *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 746 (7th Cir. Ill. 1985). Shale contends that it would be inequitable to hold it liable for the FLSA violations at issue here because it came to the table as a bonafide purchaser with no prior connection to the wrongdoers and no connection to the wrongdoers after its purchase. As noted above, however, this argument hinges upon the wrong legal standard for imposing successor liability. Most importantly, however, Shale ignores the important considerations that have merited the development of this federal labor-law doctrine of successorship.

Plaintiffs are very low wage workers whose rates of pay were set at minimum wage or just above minimum wage. Making mortgage payments, sustaining a family, paying the bills and otherwise making ends meet on a $300 to $400 weekly paycheck requires every dollar in that paycheck. See weekly payments in Plaintiffs' bounced checks attached hereto as Exhibit Group Exhibit F. The impact of the Wisconsin Tool Defendants and Dombeks' practice of nonpayment of wages on Plaintiffs was significant. Many Plaintiffs owe the amounts in their bounced checks plus fines to the currency exchanges where they attempted to cash their checks drawn from underfunded payroll accounts. SMF ¶ 30. Some Plaintiffs are currently being harassed by collections agencies. See SMF ¶ 30. One Plaintiff even filed for personal bankruptcy in the relevant period of nonpayment of wages. SMF ¶ 30 These are the kind of hardships that Congress sought to remedy through the passage of the FLSA. Courts have noted that failure to impose successor liability in cases where continuity is present and where successors had some

notice of the federal rights that were abridged would effectively undermine the Congressional purpose sought to be achieved through labor statutes like the FLSA. *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 182 (U.S. 1973) *citing John Wiley & Sons, Inc. v. Livingston*, ("Employees . . . ordinarily do not take part in negotiations leading to a change in corporate ownership. The negotiations will ordinarily not concern the well-being of the employees, whose advantage or disadvantage, potentially great, will inevitably be incidental to the main considerations.") 376 U.S. 543, at 549 (1964).

The burden imposed on Shale as a successor in providing a one time discrete remedy to to a handful of Plaintiffs is minimal compared the possibility of the remedial purpose of the FLSA being frustrated. See *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, ("the fact that the imposition of liability will have a significant fiscal impact on a successor is not prohibitive: in holding successors liable for backpay or employment discrimination damages in our previous cases, we have demonstrated a willingness to impose just such a burden.") 920 F.2d 1323, 1327 (7th Cir. Ill. 1990). Courts have not hesitated to strike balance between the competing interest of encouraging the transfer of capital and protecting federal rights by the imposition of successor liability. *Id* at 1329 (stating "this court and others have concluded that the balance between the need to effectuate federal labor and employment discrimination policies and the need, reflected in the traditional common law rule, to facilitate the fluid transfer of corporate assets is best struck by the imposition of successor liability.) *See also Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 184-185 (1973). Plaintiffs seek a discrete one-time corrective remedy that would not entail any long lasting damper on Shale or any other successor. See *Upholsters, Id* at 1326. Indeed, it is reasonable to infer that a small fraction of the value of the inventory that was produced by Plaintiffs' uncompensated labor and acquired by

Shale would be sufficient to provide Plaintiffs with the discrete remedy they seek.

### III. CONCLUSION

Shale's Motion of Summary Judgment is premature. Plaintiffs have submitted sufficient evidence to establish that a genuine issue of fact exists for trial on whether Defendant Shale had notice of Plaintiffs' claims and whether substantial continuity exists between Shale and the Wisconsin Tool Defendants. As reflected in the Second Forbearance Agreement entered into between the Dombeks, the Wisconsin Tool Defendants and First Midwest Bank, attached hereto as Exhibit I, Shale was engaged in negotiations with First Midwest Bank, and potentially the Dombeks well prior to September 21, 2010. Plaintiffs are entitled to inquire as to how far back these negotiations went and the matters discussed by the parties. Plaintiffs are also entitled to perform discovery on important equitable considerations such as the value of the inventory built through Plaintiffs' uncompensated labor, which Shale acquired, the profit generated from this inventory and the burden if any that imposing successor liability would create on Shale. For the above state reasons, summary judgment should be denied.

Respectfully submitted,

Dated: June 10, 2011

s/ Alvar Ayala
Alvar Ayala
Christopher J. Williams
Working Hands Legal Clinic
77 West Washington Street, Suite 1402
Chicago, Illinois 60602
(312) 795-9115

Attorneys for Plaintiffs